No. 25-2121(L)

# In the United States Court of Appeals for the Fourth Circuit

MICHAEL JACKSON,
ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellant,*

v.

THOMSON REUTERS AMERICA CORPORATION,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of West Virginia at Clarksburg
No. 1:24-cv-00088-MFU; Hon. Michael F. Urbanski

**BRIEF OF *AMICUS CURIAE*
SOFTWARE & INFORMATION INDUSTRY ASSOCIATION
SUPPORTING DEFENDANT-APPELLEE AND AFFIRMANCE**

Erik S. Jaffe
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Amicus Curiae*

MARCH 10, 2026

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-2121 (L)     Caption: Michael Jackson v. Thomson Reuters American Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Software & Information Industry Association
(name of party/amicus)


who is _____ amicus curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?   ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
       If yes, identify all such owners:

12/01/2019 SCC

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Erik S. Jaffe        Date: 03/10/2026

Counsel for: Amicus Curiae

ii

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ........................................................................i

TABLE OF AUTHORITIES ......................................................................iv

INTRODUCTION, INTEREST, AND SOURCE OF AUTHORITY
OF *AMICUS CURIAE* ................................................................... 1

STATEMENT ............................................................................................ 2

SUMMARY OF ARGUMENT ................................................................... 5

ARGUMENT ............................................................................................ 7

    I.    The Statute Is Grossly Overinclusive. ........................................ 8

    II.    The Law's Coverage Is Underinclusive and Does Not Align with the Interest in Protecting Certain Classes of Past and Present Public Servants. ........................................................ 17

    III.    The District Court Reached the Correct Result for the Reasons It Gave as Well as Many Others and Reversing Would Raise Numerous Problems under First Amendment Jurisprudence. ........................................................ 26

CONCLUSION ....................................................................................... 32

CERTIFICATE OF COMPLIANCE....................................................... 34

iii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Brandenberg v. Ohio,*
    395 U.S. 444 (1969) ................................................................. 28, 29

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ..................................................................... 18

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ................................................................. 19, 30

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ..................................................................... 25

*Counterman v. Colorado,*
    600 U.S. 66 (2023) .................................................................. 16, 28

*Greater New Orleans Broad. Ass'n v. United States,*
    527 U.S. 173 (1999) ....................................................... 19, 25, 26, 30

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ................................................................. 15, 17

*Ostergren v. Cuccinelli,*
    615 F.3d 263 (4th Cir. 2010) .......................................................... 31

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992) ..................................................................... 18

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995) ..................................................................... 20

*Sable Commc'ns of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989) ..................................................................... 17

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ..................................................................... 26

*U.S. West, Inc. v. FCC,*
    182 F.3d 1224 (10th Cir. 1999) ....................................................... 30

iv

*West Virginia v. Click,*
  No. 14-0472, 2015 WL 1741409 (W. Va. 2015) .................................. 23

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) ......................................................................... 18

**Statute**

W. Va. Code § 5A-8-24 ............................................. 3, 11, 14, 20, 24, 26

**Other Authorities**

Rebecca Beitsch,
  *Noem defends living on base in Coast Guard housing,*
  The Hill (Mar. 4, 2026, 11:09 AM) ...................................................... 13

Nick Breul & Desiree Luongo,
  *Making It Safer: A Study of Law Enforcement Fatalities*
  *Between 2010-2016* (Dec. 2017) ..................................................... 22, 23

Shelby Burrough,
  *Protesters gather at Governor's Mansion, demand*
  *end to ICE operations in local communities,*
  Fox Appalachia (Jan. 9, 2026, 11:07 PM) .......................................... 12

Rob Gabriele,
  *Police Employment Statistics: Which States Have the Most*
  *Police?,* SafeHome.org (Dec. 19, 2025) ............................................... 16

Alex Gangitano,
  *Harris Oct. 7 speech met with protesters outside VP residence,*
  The Hill (Oct. 7, 2024, 5:20 PM) ....................................................... 12

*Kamala Harris,*
  Wikipedia ...................................................................................... 12

Christine M. McDermott et al.,
  *Perceptions and Experiences with Judicial Security*
  *Threats: A Survey of U.S. State Court Judges,*
  60 Ct. Rev. 102 (2025) ..................................................................... 22

*Patrick Morrisey,*
    Wikipedia ............................................................................... 12

*Sheriff Eugene Crum,*
    Officer Down Mem'l Page (Apr. 3, 2023) ............................................ 22

Pete Simi et al., *Rising Threats to Public Officials:*
    *A Review of 10 Years of Federal Data,*
    17 CTC Sentinel 20 (2024) .......................................................... 21, 24

U.S. Dep't of Just.,
    UCR Summary of Reported Crimes in the Nation, 2024
    (Aug. 2025) ........................................................................... 23

## INTRODUCTION, INTEREST, AND
## SOURCE OF AUTHORITY OF *AMICUS CURIAE*[1]

*Amicus curiae* the Software & Information Industry Association ("SIIA") is keenly interested in this case because it threatens to upend the free flow of basic and factually accurate information used in all aspects of modern life. Myriad essential activities—from a company's efforts to combat fraud to an individual's efforts to obtain a job, a mortgage, or even a credit card—rely on address and telephone information. The availability of such information is also quietly essential to reaching old or new friends, fellow alumni, fellow parents, and many others. And as it relates to past and present government employees, address information is often a key part of government accountability and the political process.

SIIA is a leading trade association for software companies and those in the business of information. SIIA is dedicated to creating a healthy information ecosystem: one that fosters the creation,

---

[1] No counsel for a party authored any part of this brief. No party, party's counsel, or person other than *Amicus*, its members, or its counsel made a monetary contribution to fund the brief's preparation or submission. A motion for leave to file this brief has been submitted to the court. Appellees have consented to the filing of this brief. Appellant has stated he takes no position on its filing.

dissemination, and productive use of information. It represents nearly 400 member companies, among them publishers of software and information products, including databases, enterprise and consumer software, and other products that combine information with digital technology. SIIA member companies serve nearly every segment of society, including business, education, government, healthcare, and consumers. Many of its members rely on, and facilitate, access to public records. *Amicus*'s members and their clients collect and add value to lawfully acquired, accurate information that is already widely available. *Amicus* is uniquely qualified to help this Court in understanding the scope of the information and communication burdened by West Virginia's law and the potentially disastrous impact that law will have on many aspects of daily life and the economy.

## STATEMENT

The sweeping reach of West Virginia's version of Daniel's Law restricts numerous First Amendment protected activities involving the collection, transmission, and publishing of lawfully obtained public facts. The legislature intended that it "enhance the safety and security of certain public officials in the justice system" and "foster the ability of

2

these public servants … to carry out their official duties without fear of personal reprisal from affected individuals related to the performance of their public functions." W. Va. Code § 5A-8-24(b). But it chose to pursue that goal with a statute that is both overbroad and underinclusive.

As relevant here, the law provides:

Unless written permission is first obtained from the individual, a person, business, or association shall not *disclose, redisclose or otherwise make available* the home address or unpublished home or personal telephone number of any active, formerly active, or retired judicial officer, prosecutor, federal or state public defender, federal or state assistant public defender, or law enforcement officer under circumstances in which a reasonable person would believe that providing such information *would expose another to harassment or risk of harm to life or property*.

*Id.* § 5A-8-24(e) (emphasis added).

The statute defines the prohibited conduct, disclosure, broadly. To "disclose" includes "to publish, publicly display, distribute, deliver, circulate, post, lend, provide, advertise, or disseminate by any means including, but not limited to, electronic transmission and on any medium including, but not limited to, the Internet." *Id.* § 5A-8-24(c)(1). That sweeping coverage conceivably includes internet service providers, phone companies, and internet backbone communication companies who "distribute, deliver, [and] circulate" messages from others, generally

3

without even tracking the content of such messages. The law applies regardless of whether the discloser knows, suspects, or even has reason to ask if a person is covered by the law or if disclosure of the information would expose the covered person to harassment or the risk of harm to life or property.

The law also restricts "redisclos[ure]" of information already widely disclosed elsewhere. And by including a catchall provision applying whenever covered information is merely "ma[d]e available," the statute extends liability far beyond affirmative acts of transmission. It restricts the mere storage of information in a form even *potentially* accessible to even a single other person. Given the sweeping reach of the law, but oddly selective coverage of speakers and protected parties, the statute both captures a tremendous amount of factually accurate speech that does not meaningfully advance its security-related goals and yet omits regulation of other activity that *would* further West Virginia's asserted interests. The district court correctly concluded that such misalignment is fatal under the First Amendment.

4

## SUMMARY OF ARGUMENT

Appellees and the district court provide multiple reasons why Daniel's Law is both overbroad and underinclusive and violates the First Amendment. The decision below can—and should—be affirmed for those reasons. But those grounds for affirmance represent only a small window into the problems with Daniel's Law. *Amicus* expands upon those First Amendment problems and identifies a variety of additional and alternative constitutional concerns.

First, the statute's unconstitutional overbreadth is unsubtle: a person's home address and phone number are disclosed, redisclosed, or otherwise made available in countless ways in modern life that do not implicate West Virginia's stated interest in protecting the covered officials. The statute reaches internal business communications, data storage, business-to-business communications, third-party vendor communications with the government, library storage of phone books, transmission of messages by common carriers, and even one-to-one oral communications. The statute's plain terms burden each of those innocent communications of such information. And the risk of potential civil liability will cause many who would otherwise store or convey personal

5

information for innocuous reasons to refrain from doing so, chilling speech without any commensurate benefit to safety or security. This overbreadth fails First Amendment scrutiny.

Second, the statute is also fatally underinclusive in other ways beyond those identified by Appellees and the district court. It covers only certain public servants in the justice system while ignoring others whose participation in the system is just as necessary to its proper functioning. Similarly, the statute applies only to addresses and some phone numbers even though there are countless other, and more common, ways for the covered persons to be threatened or harassed: at work, at school, while out in public, by email, or on social media. The law thus targets communications with a limited and doubtful connection to the concerns that animate it, while leaving untouched other activity that risks the same harm. Such misalignment undermines the State's asserted interest and casts doubt on the law's effectiveness in advancing that interest. It thus fails any level of First Amendment scrutiny.

Third, beyond the statute's utterly deficient tailoring, this Court should affirm for the additional reason that Appellant's necessarily sweeping theories would do violence to still other areas of law. They

depart from longstanding precedent confirming that the communication of facts is protected speech. They give less constitutional protections to innocent speech than to speech advocating violence. They ignore that Daniel's Law is fatally underinclusive and overbroad even under the intermediate scrutiny that applies to regulations of commercial speech. And they strip speech of protection based on its accessibility, flipping First Amendment values on their head.

This Court should consider those additional and alternative grounds for affirmance, both for the sake of thoroughness as to the West Virginia law in this case and to clarify the constitutional guardrails applicable to any future attempted iteration of Daniel's Law.

## ARGUMENT

*Amicus* agrees with Appellees, at 36–43, that the law restricts far more speech than is permissible or necessary under the First Amendment to serve its purported interests. It also agrees with Appellees, at 43–45, that the law is fatally underinclusive in that it does not similarly restrict the availability and disclosure of personal information from and by the government. Finally, *Amicus* agrees that this law is a content-based restriction on speech subject to strict scrutiny.

7

*Amicus* offers the following additional arguments in support of the judgment below.

## I.    The Statute Is Grossly Overinclusive.

West Virginia's assault on vast swaths of entirely lawful and incredibly useful speech goes far beyond the examples of speech that triggered the law in the first place. As Appellees note, at 37, the overwhelming majority of the speech covered and chilled by this law poses no actual, imminent, or even *likely* threat to the protected class of government officials and their families. These innocuous applications overwhelm the rare instances of speech that might actually lead to the harms West Virginia targets. Given such overbreadth, the statute cannot survive a facial challenge under strict, or indeed *any*, heightened level of scrutiny.

In addition to Appellees' examples of valuable and innocuous speech restricted by the law, at 39–43, *Amicus* is aware—by virtue of the experiences of its member companies—of countless scenarios in which a person's home address and phone number are disclosed, redisclosed, or otherwise made available for important or mundane purposes not implicating West Virginia's concerns. To name just a fraction of these

8

scenarios, the law would regulate the availability or communication of addresses and phone numbers in:

- Law enforcement efforts to locate potential victims, witnesses, suspects, or the objects of wellness checks;
- Emergency services responses to 911 calls, fire alarms, and gas or electrical hazards;
- Fraud prevention inquiries, where businesses, government agencies, or anyone else needing to confirm a person's identity will need that person's home address and number for challenge questions, multi-factor authentication, and the like;
- Litigation activities such as serving complaints and subpoenas;
- Child-support enforcement;
- Employment and tenant background checks;
- Voter-roll audits and poll-location assignments;
- Health-care and education-related communications; and
- E-commerce activities, such as using payment applications that automatically fill home addresses and using third party verification to ensure valid shipping or payment addresses.

Indeed, private parties and the government use the covered personal information all the time. The above examples all rely, at one point or another, on the availability and transmission by individuals, businesses, and associations of information restricted by West Virginia's law.[2]

---

[2] Some companies or government agencies that run employment or background checks may perform initial identity verification themselves. Others may use trusted vendors such as Prove or iDenfy. In almost all instances, however, some restricted individual, business, or association

9

Timely access to name and address information, and its predictable transmission forms the backbone of commerce and government services across the country. Many e-commerce providers, for example, print shipping labels that include home addresses before regularly giving—disclosing—those addressed packages to third parties such as FedEx or UPS for delivery. And even within such companies, individuals repeatedly disclose, redisclose, and otherwise make available that same information to the many people in the delivery chain.

That downstream distribution creates multiple potential violations and multiplies the potential liability from ordinary disclosures within a single activity. And class-action plaintiff's lawyers are sure to seek to amplify this number of violations they bring to increase the *in terrorem* effect and coerce a settlement.

To be sure, such firms have potential defenses for that behavior and could seek written consent from each of its customers. But the possibility of consent is little comfort given the difficulty of knowing whether a

_____

will have to transmit, share, or merely make available the information covered by West Virginia's law. And the affirmative restrictions it imposes would make most such efforts illegal, or at least so legally risky that it would make them unworkable.

10

particular attempt to secure "written permission" is sufficient under the law. W. Va. Code § 5A-8-24(e). West Virginia fell short of defining that statutory term, so it is unclear whether, for example, a shrink-wrap license or blanket permission ex ante would be sufficient to avoid the law's reach. And if a blanket waiver is *not* sufficient, then the burden of complying with Daniel's Law on a case-by-case basis by verifying if a given customer is a covered person, and obtaining individualized consent for each and every downstream communication, would cripple the entire shipping process given the billions of transactions that those firms process each year.

Having such data available to be conveyed quickly and freely to those who need it both facilitates and improves the everyday lives of consumers and citizens alike. And if the ability to communicate such valuable information is lost, it would destroy the basic economic functioning of society, harming all individuals and their families, including the intended beneficiaries of West Virginia's law.

Beyond the proper functioning of the economy and government services, the information and communications regulated by West Virginia's law also undergirds public knowledge, discussion, and debate

11

about public officials and government activities such as spending, nepotism, and other forms of corruption or self-serving behavior. Many government officials, for example, are former prosecutors or law enforcement personnel. Former Vice President Kamala Harris was a prosecutor in California, and West Virginia's current governor was the Attorney General.[3] Since they are former prosecutors, both are covered persons under Daniel's Law. It borders on the absurd to suggest that private parties—like Wikipedia—could not publish the address of the Naval Observatory (the Vice President's residence) or the West Virginia Governor's Mansion, notwithstanding the possibility of protests outside such buildings that might be deemed "harassment."[4]

Daniel's Law also hinders the ability of interested parties to verify the eligibility of public officials for positions with residency requirements

---

[3] *Kamala Harris*, Wikipedia, https://tinyurl.com/d48scujp (last visited Mar. 10, 2026); *Patrick Morrisey*, Wikipedia, https://tinyurl.com/2v47uv2w (last visited Mar. 10, 2026).

[4] Such protests do happen. *See, e.g.,* Shelby Burrough, *Protesters gather at Governor's Mansion, demand end to ICE operations in local communities*, Fox Appalachia (Jan. 9, 2026, 11:07 PM) (protest at West Virginia's Governor's Mansion), https://tinyurl.com/ynynabn3; Alex Gangitano, *Harris Oct. 7 speech met with protesters outside VP residence*, The Hill (Oct. 7, 2024, 5:20 PM) (mentioning the Naval Observatory "on Massachusetts Avenue" as Harris' home), https://tinyurl.com/kcuxwaae.

or to police public spending and potential misuse of public resources, either by the officeholders themselves of their families.[5]

On a more mundane level, individuals disclose or otherwise make available the home addresses or personal phone numbers of friends and acquaintances regularly. Photos taken during a social occasion at someone's house often contain geolocation information that could reveal a covered person's address, risking liability both for the person sharing and for the platform hosting any such photos. Likewise, group-chats or multiparty text messages often use personal cell-phone numbers, creating a risk of liability if a person so much as adds a covered person to the chat without prior written permission. The statute also threatens liability for what would otherwise be ordinary social interactions such as parties, dinners, and study-groups that may be held at the house of a covered person.[6] Similarly, whenever a parent seeks to learn the phone

---

[5] *E.g.*, Rebecca Beitsch, *Noem defends living on base in Coast Guard housing*, The Hill (Mar. 4, 2026, 11:09 AM) (addressing then-Department of Homeland Security Secretary Kristi Noem's defense of using Coast Guard housing), https://tinyurl.com/sr5pr7th.

[6] If one student invites another to the house of a third who happens to be a family member of a covered person, that casual invitation could easily be deemed, post-hoc, to have exposed the third student to various covered risks—unwanted attention, accidental property damage, or, as Appellant

13

number and address of one of her child's friends, there will always be a risk that such information will be communicated in violation of the statute.

But the statute's reach goes further still, applying whenever covered information is "ma[d]e available." W. Va. Code § 5A-8-24(e). West Virginia thus imposes potential liability even for actions as basic as maintaining a person's contact information on one's phone. Such information is often available or transmitted to others such as parents, family members, and—if the phone stores a contact list in the cloud—to the companies hosting that information or merely delivering the information to and from the servers.[7] Even storing or sharing information *within* businesses or institutions, such as when a school gathers contact information for use by its alumni outreach personnel or when a company's HR employee gathers and makes internally available

---

would have it, the supposedly inherent risk that always accompanies the availability of address information. Appellant's Br. at 4, 44.

[7] Likewise, merely storing geolocated pictures of the covered person at their house, whether in the cloud or on a local device, would seem to make such location information (*i.e.*, the address in different form) "available" to any number of third parties and would seem to require prior written consent even to take the picture. The list of potential applications of the law is never-ending.

the home addresses and phone numbers of employees for numerous business-related reasons.

The "make available" catchall thus exponentially expands the degree of overbreadth involved, regardless of whether the information was already available to the public at large, was never accessed by or transmitted to another person, or even where there was written permission for some, but not necessarily all, of the covered acts.

The staggering sweep of this law illustrates not only its overbreadth and lack of tailoring, but also the propriety of a facial challenge. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (explaining that First Amendment facial challenges weigh legitimate and illegitimate applications of a given law). While each of these examples may seem absurd, each seemingly falls within the plain text and reach of West Virginia's law, thus triggering the need for the speaker—the person who conveys or makes available the relevant information—to exercise extreme caution given the mixed negligence and strict liability regime in West Virginia.

Such a speaker would need to determine whether the subject of the communication is or was a covered person or a family member of a

15

covered person who happens to live at the same address. The speaker then would have to consider whether such information might be misused by the recipient or some further downstream recipient of the information and hence "expose" the object of the information, *or anyone else* to "harassment" or the "risk of harm." Of course, that inquiry may well be impossible given the sheer number of potentially covered persons.[8] And because the law applies "without regard to scienter," it carries a significant risk that private parties will avoid conveying this entire category of information to *anyone* to avoid the indeterminate rabbit holes addressed above and expensive class actions seeking exorbitant damages or windfall settlements. *See Counterman v. Colorado*, 600 U.S. 66, 77 (2023).

In short, there are an abundance of instances of protected and harmless speech covered by West Virginia's law relative to the shockingly rare instances of covered speech that is actually used by third parties to

---

[8] There are, for example, *thousands* of current police officers in West Virginia alone. Rob Gabriele, *Police Employment Statistics: Which States Have the Most Police?*, SafeHome.org (Dec. 19, 2025), https://tinyurl.com/4ay6cpkf. The statute applies not only to them, but also to anyone who has ever served. And it does not seem limited to persons having served in West Virginia or even living in West Virginia. It thus could reach many millions of persons throughout the country and beyond.

16

cause harm. Whatever few instances of the law being constitutionally applied—for example conveying address information with the purpose and intent of sending someone to do harm—they are overwhelmed by the tsunami of instances in which the law is not constitutional. The law is thus facially unconstitutional. *Moody*, 603 U.S. at 744.

## II.    The Law's Coverage Is Underinclusive and Does Not Align with the Interest in Protecting Certain Classes of Past and Present Public Servants.

Despite the law's stunning and unconstitutional breadth, it is also oddly and fatally *underinclusive* given its limitations on and discrimination between potential speakers and between the objects (the covered persons) of such regulated speech. Such under-inclusiveness shows that the law does not meaningfully advance West Virginia's asserted interest in protecting public servants. The law thus fails any level of First Amendment scrutiny.

1. *Amicus* agrees with the Appellees, at 17–20, and the district court, JA539, that Daniel's Law is subject to strict scrutiny and must thus be narrowly tailored and meaningfully further the government's interest. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). *Amicus* also agrees with Appellees, at 36, that the law is underinclusive

17

because it fails to equally restrict the identical information disclosed and made publicly available by the government. But it is also underinclusive in (1) its exclusion from coverage for many other participants in the justice system, other government workers, and politicians facing equal or greater risks and (2) its disparate protection of government employees but not non-government critics who often face threats and harassment for their political activities.

An underinclusive law fails to meaningfully further the governments interest almost by definition and, at the very least, "raises a red flag." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). Underinclusiveness raises "doubts about whether the government is in fact pursuing the interest it invokes" and suggests that the stated interest is not compelling. *Id.* at 448–49 (citations omitted). Because the government bears the burden of justifying a law that restricts speech, if it offers "no persuasive reason" for underinclusivity, that "alone" can be "enough to defeat" a regulation of protected speech. *Brown v. Ent. Merchs. Ass'n,* 564 U.S. 786, 802 (2011).

Further, even if this Court entertains Appellant's (erroneous) contention, at 30–36, that Daniel's Law only regulates commercial speech, underinclusivity is still a red flag under the intermediate scrutiny that applies to regulations of commercial speech. *Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 183, 190 (1999) ("*New Orleans Broadcasting*") (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 566 (1980)). Even under such intermediate scrutiny, "the Government bears the burden of identifying a substantial interest and justifying the challenged restriction." *Id.* at 183.

In *New Orleans Broadcasting,* for example, the Supreme Court invalidated a commercial-speech regulation after finding that it was "so pierced by exemptions and inconsistencies" that the government's claimed interests could no longer hold water. 527 U.S. at 190. The Court held that the law was underinclusive because it imposed only a "(partial) broadcast ban" on disfavored advertising that, like Daniel's Law, "select[ed] among speakers conveying virtually identical messages." *Id.* at 194. That was fatal "[e]ven under the degree of scrutiny … applied in commercial speech cases." *Id.* at 193–94; *see also Rubin v. Coors Brewing*

19

*Co.*, 514 U.S. 476, 488–89 (1995) (exceptions to a law against displaying alcohol content on beer labels—coupled with the inconsistency of rules governing other advertising of such information—undermined the "purpose of the labeling ban" and all but guaranteed that the ban "will fail to achieve" its end).

2. Here, whatever standard of scrutiny applies, West Virginia's law is fatally underinclusive and discriminatory in its selection of disfavored speakers and favored protectees.

First, while the law is concerned with "the safety and security" of public officials, it only covers "certain public officials in the justice system," leaving other public officials, even within the justice system— such as judicial law clerks, traditional court clerks, judicial assistants, and others—entirely unprotected. W. Va. Code § 5A-8-24(b).

Second, the law is underinclusive because it limits the disclosure of only two bits of personal information while ignoring countless others— such as work addresses, email, work phone numbers, and social media accounts— through which a person of ill intent could harass or otherwise harm covered persons. And it does so even though far more instances of

20

harassment, threats, or actual harm occur via work phones, on social media, in public, or at the office itself.

For example, a 2024 study of the 501 federal charges brought for threatening public officials between 2013 and 2022 found that as much as 17% of all threats against public officials are communicated *exclusively* on social media.[9] Another 17% of all threats were handwritten or typed.[10] By contrast, only 31% were communicated by phone, and it is unclear whether those phone threats were received on a home phone—which Daniel's Law would reach—or on an uncovered work phone.[11] But West Virginia's interest is surely just as undermined when a public official is threatened online, in a letter delivered to her workplace, or on her work phone. Daniel's Law ignores threats in these omitted categories—online, through letters at work, and through workplace phone numbers.

Then there is the problem that the most egregious cases, physical attacks of public officials, occur away from their homes in most cases. In

---

[9] Pete Simi et al., *Rising Threats to Public Officials: A Review of 10 Years of Federal Data*, 17 CTC Sentinel 20, 23 & tbl. 1 (2024) (citation omitted), https://tinyurl.com/4s75rwjt.

[10] *Ibid.*

[11] *Ibid.*

a survey of judges "physically attacked because of their position as a judge," 75% reported being attacked away from their home.[12] The majority was attacked at the courthouse.[13] This means that Daniel's Law would do nothing to prevent most physical attacks on judges. This underinclusive law thus ignores 75% of the scenarios it is supposedly meant to address.

Still other acts of targeted violence against public officials simply occur in public places, like the 2013 murder of Sheriff Eugene Crum as he ate lunch in his car near the Mingo County Courthouse.[14] Indeed, one study examining 81 times that police were ambushed between 2010 and 2016 showed that only 14 were either "at their home or on their way home."[15] And it is unclear that Daniel's Law would have done anything

---

[12] Christine M. McDermott et al., *Perceptions and Experiences with Judicial Security Threats: A Survey of U.S. State Court Judges*, 60 Ct. Rev. 102, 106 & fig. 5 (2025), https://tinyurl.com/49mmhhn7.

[13] *Ibid.*

[14] *Sheriff Eugene Crum*, Officer Down Mem'l Page (Apr. 3, 2023), https://tinyurl.com/2k3m2jvj.

[15] Nick Breul & Desiree Luongo, *Making It Safer: A Study of Law Enforcement Fatalities Between 2010-2016*, at 50 & fig. 13 (Dec. 2017), https://tinyurl.com/mur8w6kb.

to protect those officers since they "were essentially stalked by suspects with a grudge or criminals wanting to disrupt an investigation."[16]

These statistics also say nothing of the fact that most violent crimes are committed by those with some relationship to the victim and are therefore more likely to know the victim's address or phone number. In 2024, for example, around half of reported homicides were committed by someone who personally knew the victim.[17] For assault, that percent was even higher at 73.6%.[18]

West Virginia follows those national trends. For example, in 2012, the brother of Mayor Thomas Hatcher's daughter-in-law tragically murdered Mayor Hatcher in his home "to prevent [Mayor Hatcher] from making a criminal complaint" against her for theft. *West Virginia v. Click*, No. 14-0472, 2015 WL 1741409, at \*1 & n.2 (W. Va. 2015). Daniel's Law would not have prevented that murder—or any of the other violent crimes committed by those with some existing personal or social

---

[16] *Id.* at 50.

[17] U.S. Dep't of Just., UCR Summary of Reported Crimes in the Nation, 2024, at 6 & fig. 3 (Aug. 2025), https://tinyurl.com/2s93k3m8.

[18] *Id.* at 7 & fig. 4.

relationship to the victim and hence likely knowledge of their home address and phone number.

Third, by gerrymandering the law to apply only to "officials in the justice system," W. Va. Code § 5A-8-24(b), West Virginia leaves unprotected countless other public officials who play critical roles in society. It likewise ignores other public servants who face equal or greater threats, such as politicians not having previously served in covered positions, heads of agencies, federal or state cabinet members, and many others. The Simi study addressed above, for example, found that one-third of "public officials surveyed" had "personally experienc[ed] abuse, harassment, or threats related to their role as a public official."[19] Worse still, it excludes private persons whose political activity exposes them to threats and harassment.

Of course, the fact that these other public officials are *not* covered despite serving in similarly important government roles not only confirms that the law is underinclusive, it further solidifies the district court's conclusion that Daniel's Law is a content-based restriction on speech. After all, the law's application turns on the identity of the owner

---

[19] Simi et al., *supra* note 9, at 21.

of the personal information. Since Daniel's Law makes it "more difficult … to inform the public" about the personal information of some officials than it does for others, it is content based. *See Reed v. Town of Gilbert*, 576 U.S. 155, 166–68 (2015). And the fact that the law favors certain past and present government employees while excluding private critics and allowing the government itself to disclose a covered official's address or phone number suggests a speaker- and viewpoint-discriminatory impact flowing from this content-based restriction in the law. *See Citizens United v. FEC*, 558 U.S. 310, 340–41 (2010).

3.  In short, Daniel's Law can hardly be said to "directly advance" West Virginia's interest as is required even under the intermediate commercial-speech test. So much of the speech that implicates West Virginia's stated interest is left unregulated, and the law—even when it does apply—does not prevent most of the instances of harm. *New Orleans Broad.*, 527 U.S. at 189. Daniel's Law—at most—addresses a sliver of a broader issue of harassment or violence against persons for their public conduct: it purports to mitigate the small chance that (1) a public official connected to the justice system or members of her family will be harmed (2) by a stranger (3) that sought out the public official's home address or

25

phone number via private sources and could not get that information from governmental sources. W. Va. Code §§ 5A-8-24(c)(1), (e). Whatever standards apply, the law is unconstitutional because the "attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it." *New Orleans Broad.*, 527 U.S. at 190.

## III. The District Court Reached the Correct Result for the Reasons It Gave as Well as Many Others and Reversing Would Raise Numerous Problems under First Amendment Jurisprudence.

The judgment below is also correct for a host of other reasons that this Court should consider.

1. Appellant's lead argument (at 11–12) is that the communication of data is not even protected by the First Amendment because data is not intended to and does not communicate a message. That argument is frivolous and conflates cases involving conduct claimed to be expressive, *see* Appellees' Br. at 20–21, with those involving pure speech, such as the transmission or *communication* of data here. The cases that do address the dissemination of information (*i.e.*, facts or data) are unanimous that it is speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (collecting cases).

26

For this reason, to adopt Appellant's argument would do untold violence to multiple lines of caselaw involving the communication of facts, not the least of which is defamation law, which by Appellant's reasoning merely involves the dissemination of *false* facts and so would not trigger any First Amendment scrutiny. Similarly, if a newspaper published a public court docket, is it engaging in protected "speech" or unprotected dissemination of "data"? What if a nonprofit watchdog aggregates the same information to expose conflicts of interest? Appellant has no answer to such questions because there is none. The suggestion that only the latter is speech, and thus the former could be curtailed without constitutional concern, makes no sense at all.[20]

---

[20] Appellant's attempt, at 12, to require protected speech to include something more than just information is equally frivolous. The notion that communication is only protected "speech if" it carries an intended "message or thought" in a "complete speech act," beyond the message of "here is information you might find interesting or useful," conflates speech with opinion or argument. Sometimes the only "message" being communicated is information. When a newspaper publishes the time and date of a march, it may simply be seeking to inform and let its readers choose what to do with that information—attend the march or pick a different route to work to avoid traffic. Requiring a speaker to have and communicate some further motive or purpose in disclosing facts has no support in First Amendment caselaw.

27

2. Appellant's entire effort to elevate speculative and rare harms above First Amendment protections for overwhelmingly innocuous and valuable speech contradicts how the First Amendment addresses prospective dangers from speech in other, more hazardous, contexts. In *Brandenberg v. Ohio*, for example, the Supreme Court explained that even the "advocacy of the use of force or of law violation" may have First Amendment protections if it is not "directed to inciting or producing imminent lawless action and … likely to incite or produce such action." 395 U.S. 444, 447 (1969) (per curiam). And even true threats of violence—another "historically unprotected category"— "require[] proof that the defendant had some subjective understanding of the threatening nature of his statements." *Counterman*, 600 U.S. at 69.

What these and other cases illustrate is that even if an interest is compelling in the abstract—avoiding violence, harassment, or other forms of injury—the danger must be clear and present in the particular instance of speech before such speech can be restricted. West Virginia's law simply ignores this historical bar even for an abstractly compelling interest.

28

As shown above, most of the speech restricted here poses no threat of harm. And even that speech that theoretically risks harm involves harm that is neither clear nor present. Indeed, the law is worded in a manner that seems to expressly flout *Brandenburg*'s strict test for regulating speech in the name of preventing some unspecified future, non-imminent, mere risk of violence. *See* 395 U.S. at 447. Using low probability words such as "could," expose to "risk," and what a reasonable person might think—a negligence standard—not only falls far short of establishing imminence, it doesn't even try.

Because Daniel's Law requires neither a showing that a disclosure is *likely* to cause harm nor that the disclosing party actually knows the covered person's status, any decision upholding it would result in a First Amendment regime that affords *more* protection to express advocacy for unlawful conduct and true threats than it affords simply to the overwhelmingly innocent dissemination of true facts.

3. For the reasons addressed above, the Court could also affirm even if it agrees with Appellant that Daniel's Law only covers commercial speech. After all, even intermediate scrutiny requires a law to be tailored to avoid the significant overbreadth and underinclusivity issues

29

addressed in parts I and II. *See Cent. Hudson,* 447 U.S. at 572; *New Orleans Broad.,* 527 U.S. at 190. This court should expressly hold as much in the alternative.

4. A final problem with Appellant's theory is his view, at 25, that making public information more accessible—such as by aggregating it or making it more easily searchable—somehow creates a greater privacy invasion than the original public disclosure itself. As the Tenth Circuit has held, a government's broad interest in privacy is not substantial enough to block protected speech even under the more relaxed commercial-speech test. *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1235 (10th Cir. 1999). The same conclusion necessarily follows when the government's burden is to assert a compelling interest under strict scrutiny.

Even if the privacy interest in address information *could* be a sufficiently strong interest standing alone, the marginal improvement in ease of access as between a privately aggregated database and a publicly accessible government database is not substantial and is ephemeral in any event. Making it marginally more difficult to access information that might, at some point by some unknown person, be used for harm, falls

30

far short of substantial efforts to combat violence or harassment. And, as the government itself eventually updates its data systems or even hires private parties to manage and run those systems, any trivial efficiency burden placed on prospective wrongdoers will vanish.

Furthermore, using the efficiency of communication to dilute or override First Amendment protections is a dangerous path. Appellant's implied suggestion that, the more accessible speech becomes, the less it is protected, is a recipe for constitutional circumvention in the digital age. These days, social media, search engines, and data platforms have the power to amplify exponentially the reach of and audience for speech. One would ordinarily have thought that more information and speech available to a broader audience was a First Amendment good, not a reason for functional repeal.

Worse, if Appellant's aggregation and efficiency theory were correct, it would create considerable tension with Fourth Amendment jurisprudence as well. Under the Fourth Amendment, "one's 'reasonable expectation of privacy' cannot encompass anything exposed to the public." *Ostergren v. Cuccinelli*, 615 F.3d 263, 282 (4th Cir. 2010). It is anomalous, to say the least, that public information can lose Fourth

31

Amendment privacy protections against the *government,* while simultaneously carrying sufficient privacy weight to overcome First Amendment scrutiny of restrictions on aggregation or accessibility. The Supreme Court has never suggested that privacy interests receive *less* protection against government searches than against competing First Amendment freedoms. Yet that is the unavoidable implication of treating aggregation of already public information as the decisive privacy harm sufficient to justify restrictions on speech.

For each of these reasons, adopting Appellant's theories as to why Daniel's Law passes constitutional muster would do significant violence to other areas of law. Avoiding such consequences is an additional and alternative reason to affirm the judgment below.

## CONCLUSION

Daniel's Law is fatally overbroad and underinclusive. And any decision upholding it would do violence to the First Amendment and to other areas of law. This Court should affirm.

March 10, 2026

Respectfully submitted,

*/s/ Erik S. Jaffe*
Erik S. Jaffe
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Amicus Curiae*

33

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,285 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

March 10, 2026

*/s/ Erik S. Jaffe*
Erik S. Jaffe

34